UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| v. | ) | Cause No. | 2:10 CR 109 RL |
| | ) | | |
| | ) | | |
| MARIN ANAYA | ) | | |

### GOVERNMENT'S SENTENCING MEMORANDUM

Comes now the United States of America, by counsel, Joseph A Cooley, Trial Attorney, United States Department of Justice, Criminal Division, files the following sentencing memorandum:

**The PSR**

On September 25, 2012, a jury returned guilty verdicts on Count 1, conspiracy to commit racketeering activity, and Count 2, conspiracy to possess with intent to distribute 5 kilograms or more of cocaine and 1000 kilograms or more of marijuana. The Presentence Investigation Report (hereinafter "PSR"), determines that the offense level is 43 and a criminal history category of VI. The guideline range is life imprisonment.

*The Offence Conduct*

1) Christina Campos Murder

   a. Facts

The Government acknowledges that the Defendant was acquitted at trial of the charges related to the Christiana Campos murder that occurred on April 22, 2009 at 10754 S Hoxie, Chicago, Illinois. During the trial, there were issues with in court identification of the shooter.

- 1 -

Mary Gonzalez testified that she observed a person shoot a firearm between two cars, then go inside the front passenger side of the van, and the van then sped away northbound on Hoxie Avenue. The location that Ms. Gonzalez observed the person shoot the firearm was the same location that Christian Campos was later found suffering from a mortal bullet wound.

Two additional witnesses, Benjamin Daniels and Isaac Wilhelm testified that they were walking on Hoxie Avenue with Christina Campos when they observed a van driving southbound on Hoxie Avenue. The van then made a u-turn at the intersection of 108th and Hoxie and then pulled up to them facing northbound on Hoxie Avenue. The occupants of the van, apparent members of the Latin Kings street gang, confronted the two of them and Christina Campos, being members of the Latin Counts street gang. This was followed by the Latin Kings getting out of the van and chasing the three of them, initially throwing bottles and then shooting a firearm at Daniels and Wilhelm as they ran eastbound down 108th Street.[1]

During the trial, the government introduced a video recording taking from a street camera located at the corner of 107th Street and Hoxie Avenue. The recording showed a flash of light coming from the direction of 108th Street and Hoxie. Shortly thereafter, the recording captured a van speeding northbound on Hoxie Avenue. This activity was later followed by police vehicles responding to the scene with their emergency lights activated heading southbound on Hoxie Avenue.

    b.    Argument

        i.    A Latin King shot and killed Campos

---

[1] Counsel for Anaya argues that none of the Latin Kings had a firearm. Daniels' and Wilhelm's testimony is corroborated by Vargas when he testified that he required Latin King members to carry a firearm if they go into a rival gang's neighborhood. (R 781, pg 82-83) In addition, Ellis questioned the plausibility of the Latin Kings, an in

During the trial, Mr. Tavitas, counsel for the defendant, challenged Ms Gonzalez's identification of Martin Anaya during a lineup conducted at Area Two Chicago Police Department headquarters on May 7, 2009. Mr. Tavitas implied throughout his questioning of various witnesses that Christina Campos was actually shot by "friendly fire," i.e. a fellow Latin Count intending to shoot a firearm at the Latin Kings.

The government asserts that the evidence supports that the person who fatally shot Christina Campos was a Latin King. Ms. Gonzalez's testified that the person who shot a firearm in the area where Campos was mortally wounded retreated to the van just moments before the van sped northbound on Hoxie Avenue. Whether that person was Martin Anaya or one of his Latin King companions, Anaya should be held accountable under the federal sentencing guidelines for Campos' death.

The evidence at trial established that the Latin Kings were a criminal enterprise involved in numerous acts of violence, including murders. The Latin Kings targeted rival gang members such as the Latin Counts and Latin Dragons for these acts of violence. Martin Anaya and the other three Latin King members road in Anaya's van to an area that is known to be controlled by Latin Counts, 107th block of south Hoxie Avenue.[2] Once the Latin Kings entered that block, there was a strong probability that such action would result in violence and possible death. Anaya aided and abetted that action by providing the vehicle used to transport the Latin King members to the 107th block of south Hoxie Avenue. Further, it should be noted that Anaya was the senior Latin King member of all the participants.

---

particular Clay, entering Latin Count territory unarmed. (R. 780, pgs 19-20)

[2] Zambrano and Ellis all testified that the location Campos was shot was an area known to be controlled by the Latin Counts. (R. 79, pg 11 & R. 780, pg 20)

In addition, under *Pinkerton* it was reasonably foreseeable that once members of the Latin Kings, "riding four-deep," entered into a rival gang's neighborhood, violence will follow, including murder. *United States v. Pinkerton*, 328 U.S. 640, 642-43 (1946).  For that reason, whether Anaya was the person to fatally shoot Campos, or another Latin King companion was the shooter, Anaya should also be held accountable for this reasonably foreseeable conduct. Id.

    ii.  Felony Murder

Under Illinois law, an individual commits first degree murder if he causes an individual's death while "attempting or committing a forcible felony other than second degree murder." 720 Ill. Comp. Stat. 5/9-1 (2011).   Daniels and Wilhelm testified that as they ran eastbound down 108th Street, the Latin Kings first threw bottles and then were shooting a firearm at them. Clearly shooting a firearm would be considered a forcible felony.[3]   See: *People v. Toney*, 337 Ill.App.3d 122 (Ill. App. Ct. 2003).   However, if the Court were to discount their recollection as to who was shooting, Kings versus Counts, their testimony that the Latin Kings were throwing bottles at them was corroborated by evidence collected at the crime scene.

The Latin Kings' conduct of chasing and throwing bottles at rival gang members does not constitute any of the enumerated "forcible felonies."   However, the catch-all provision at the end of the statute defines "forcible felony" as "any other felony which involves the use or threat of physical force or violence against any individual."   Under this clause, Illinois courts have determined that "mob action," is a "forcible felony" and can thus constitute a predicate felony under the felony-murder law.   *People v. Davis*, 213 Ill.2d 459 (Ill. 2004) In Illinois, "mob

---

[3] 720 Ill Comp. Stat. 5/2-8 (defining "forcible felony" as "treason, first degree murder, second degree murder, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, residential burglary, aggravated arson, arson, aggravated kidnapping, kidnapping, aggravated battery

action" is a felony when the defendant engaged in "the knowing or reckless use of force or violence disturbing the public peace by two or more persons acting together and without authority of law." 12 720 Ill. Comp. Stat. 5/25-1 (2011), subsection (a)(1).

Anaya and three other Latin Kings drove to the Latin Count territory in Anaya's van. At least two of the Latin Kings began to chase the Latin Counts while throwing bottles at the Latin Counts. This use of force by the Latin Kings can be considered "mob action."

Latin King members testified that "posting up," that is standing guard with access to a firearm, is the normal day-to-day obligations of the Latin King members.[4] These members are required to lookout for rival gang members and shoot at them if the rivals merely enter the neighborhood. Anaya and the other Latin Kings knew, or should have known, that the Latin Counts would likely have similar protocol when rival gang members enter the Counts' neighborhood. Once the Latin Kings entered the Count neighborhood, turned the van around to confront the Latin Counts, there was a strong probability that the Latin Kings would draw gunfire. After the Latin Kings jumped out of the van and started throwing bottles at the Latin Counts, the probability of drawing gunfire escalated to relative certainty of the Kings being shot at by Counts coming to the aid of brothers and sister. Consequently, Anaya's and the other Latin Kings' conduct was a direct and proximate cause of Campos being fatally shot. For that reason, Anaya should be held accountable for Campos' death.

    2)    Drug Conspiracy

        a.    Facts

---

resulting in great bodily harm or permanent disability or disfigurement and any other felony which involves the use or threat of physical force or violence against any individual").

[4] Ellis mentioned "posting up" as his regular duties. (R. 780, pg 16)

i.   Drug Quantities

Several witnesses testified that the Latin Kings were distributing in excess of 150 kilograms of cocaine and 1000 kilograms of marijuana. Jose Zambrano, a/k/a "Speedy," testified that he distributed cocaine and marijuana as a member of the Latin Kings. (R. 748, pg 57) Zambrano recalled an incident when he was 13 years old he delivered a kilogram of cocaine to co-defendant Sisto Bernal. (Id.)  Zambrano further testified that in just over a two-week period in 2005, he distributed approximately 150 kilograms of cocaine. (R.149, pg 39) Ironically, Zambrano was holding the 150 kilograms of cocaine for Bernal. Zambrano testified that nine of out ten times he was selling his cocaine to other Latin King members. (Id., pg 43) Zambrano acknowledged that Anaya was a small drug dealer and that he recalled only providing Anaya "eight ball" or 3.5 grams of cocaine on two occasions. (Id., pgs 43-44.)

Alexander Vargas, a/k/a "Packman," also testified that he distributed cocaine and marijuana. (R. 781, pgs 49 & 70). Vargas conceded that the Latin Kings distributed large quantities of cocaine and marijuana. (Id., pgs 49, 50 & 70) Vargas testified that Latin Kings distributed 1000s of kilograms of marijuana and that he would commonly pickup 500 pounds of marijuana at a time. Vargas recalled two large stashes of cocaine consisting of 60 and 150 kilograms.  (Id., pg 50)

ii.   Use of Firearms

Throughout the course of the trial, every Latin King member who testified explained that guns were commonly used by the members. Vargas testified that, as the highest ranking member in the Southeast Region, he would require members to have access to guns while in the neighborhood.  (Id., pg 82) If Vargas caught members that did not have access to firearms while

in the neighborhood, they would be violated. (Id., pg 83).

Zambrano testified that all the Latin King members knew where the guns were stored. (R. 53-54) Zambrano was specific when Mr. Tavitas asked him about members' knowledge of firearms:

> Q. Would I, as a soldier, automatically have a weapon or would I get the weapon from you or someone else?
> A. It depends if -- a soldier always know where to get a weapon from. He could get it from -- if you're a member of 89th, you already know where the guns are at on 89th. So you could go there at any time and grab a gun, or if you're a member of Bush, if you're a member of 99th, a member of any chapter, you can go -- as long as you're a member of that chapter and you know where the guns are located, you can go and grab a gun at any time. You don't need permission. (Id.)

Aside from Anaya's knowledge of the Latin Kings' guns, there was testimony of Anaya possessing a firearm during the course of the RICO and drug conspiracies. Zambrano testified that there was an incident where Anaya pulled a gun and fired the weapon. (Id., pg 80) Zambrano explained that Anaya accused a fellow member Jermaine Ellis of being behind an incident where another Latin King was shot. (Id.) Both Ellis and Anaya were violated for this incident. (Id.) Jermaine Ellis also testified about this incident during which time Anaya shot a weapon. (R. 780, pg 84)

In addition, Anaya has one arrest for a firearm. (R. 861, ¶¶ 43 &44) Anaya's PSR indicated that he was convicted of Aggravated Battery with a Firearm from an incident that occurred on September 25, 1993.

      b.    Argument

          i.    Drug Quantity

Clearly Anaya was not a major drug trafficker. There was limited evidence presented at trial of Anaya's direct involvement of distributing drugs. As stated above, Zambrano recalled

two transactions involving 3.5 grams of cocaine. Nevertheless, the jury recognized that Anaya's activities further the drug trafficking of his fellow Latin King members by finding on their special verdict form that he was responsible for 5 kilograms or more of cocaine and 1000 kilograms or more of marijuana at to Count 2. (R. 578) Anaya has been a member of the Latin Kings since approximately 1989. During this period of time, Anaya knew, or should have know, that the Latin Kings distributed in excess of 150 kilograms of cocaine and 1000 kilograms of marijuana.

####    ii.    Weapons Enhancement

The Latin Kings' primary tool of their RICO and Drug trafficking conspiracies was the firearm. Vargas testified that some Latin King members and associates would acquire cocaine by robbing other drug dealers. (R. 781, pgs 55, 56, & 58). As stated above, the guns were used to protect the Latin King neighborhoods where they were distributing drugs. As with the drug quantities, the use of firearms was reasonably foreseeable to Anaya during the several decades that he was a member of the Latin Kings.

### *Acceptance of Responsibility*

Anaya argues that he should receive a two-level reduction for Acceptance of Responsibility due to his contention that he would have pleaded guilty but for the government's insistence of him acknowledging his involvement in the Campos murder. The government asserts that there was not clear indication of Anaya's willingness to go through with a guilty plea. The meeting with Anaya was abruptly terminated after Anaya broke off discussions with the government and demanded a trial.

For a sentence departure under the notion of "accepting responsibility," the defendant has

to prove by a preponderance of the evidence that he is entitled to the sentence reduction. As this is a factual finding by the sentencing court, the review standard is clearly erroneous. It is only in "extraordinary cases" where this type of reduction is granted after the defendant goes to trial. See: *US v. Portillo-Valenzuela*, 20 F.3d 393 (10th Cir. 1994). See also, *US v. Purchess*, 107 F.3d 1261 (7th Cir. 1997) (Defendant offered no reason for the court to believe that the district court's finding was clearly erroneous.)

**18 U.S.C. § 3553(a) Factors**

Title 18, United States Code, Section 3553(a) sets forth a number of factors, including but not limited to, the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law and provide just punishment; and the need for the sentence imposed to afford adequate deterrence and protect the public.

In conclusion, based upon all the Section 3553(a) factors, the government respectfully requests the Court to sentence the defendant to a sentence that includes a period of incarceration for life.

Respectfully submitted,

MYTHILI RAMAN
ACTING ASSISTANT ATTORNEY
GENERAL


s/
Joseph A. Cooley
Trial Attorney
U.S. Department of Justice
Criminal Division – OCGS

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2013, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Indiana, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record in this case.

s/ Joseph A. Cooley
JOSEPH A. COOLEY
Trial Attorney
United States Department of Justice
Criminal Division, OCGS
